Whitaker, Judge,
delivered the opinion of the court:
On December 1, 1958, we held that the original plaintiff in this case, which had been “nationalized” by the Presidium of the Provisional Supreme Soviet of the Estonian Soviet Socialist Republic, had no title to the steamship Maret at the time it was requisitioned by the defendant, which was on September 16,1941 (126 C. Cls. 809).
This case is now before the court on the petition of the intervenors, to wit, Tallinna Laevaehisus (Tallinn Shipping Company), Josep Ferdinand Maipalu, by A. Nurmiste, *815 Mandatory, Isaak Kain, Liquidator and Administrator of the Estates of Johannes Linkruus, Theodor Liiman, Isaak Kain, Julius Truuberk, and Johannes Inkapool. Defendant does not deny they are entitled to recover such sum for the requisition of their vessel as may be determined to be just compensation. The question presented is the just compensation to which they are entitled.
The intervenors presented three expert witnesses who testified on this question. One of them, a man by the name of Kjeldsen, based his testimony on the prices at which other vessels, which he thought were comparable to the Maret, had been sold, but he relied chiefly on the sale price of the Haifa Trader, which had been sold to the Irish Government by the Government of Palestine. This was sold for 82,500 pounds. The rate of exchange at that time was one pound for $4.02. Kjeldsen made allowance for the difference in age, tonnage, speed, and fuel consumption of the two vessels, and arrived at a value for the Maret of $353,628, provided the necessary repairs had been made to put her in class.
Bergland, another expert, based his valuation of the Maret on the value at which certain Swedish vessels were sold along about the time that the Maret was requisitioned. After making allowances for difference in age, tonnage, speed, and fuel consumption, Bergland arrived at the figure of $363,696 for the Maret.
The intervenors also introduced a man by the name of Bagger, who valued the Maret upon the basis of the cost of its reproduction, less depreciation. On this basis he arrived at a value of $338,000.
Defendant, on the other hand, introduced the testimony of a man by the name of Rutland, who fixed the value of the ship at $220,173, which was based upon sales of vessels both on the domestic and foreign markets.
Defendant also introduced the testimony of a man by the name of Pierot, who valued the vessel at $180,000, based upon the sale price of three British flag vessels, the sale of which was subject to restrictions on sales under the laws of Great Britain. But, making allowances for the fact that the Maret was not subject to the restrictions, he found the value of the Maret to be $180,000.
*816 Pierot’s estimate of $180,000 was based alone on the sale price of three British ships. We think these sales alone do not establish market value. The British Government had imposed severe restrictions on the sale and use of all British vessels. A fair valuation must take into account not only what an owner might be able to obtain on the British or American markets, but also on markets free of restrictions, because, after the libels had been discharged, the vessel could proceed anywhere a favorable price could be obtained. When Pierot compared the Maret with the Haifa Trader and used the price at which this vessel was sold, he arrived at the figure of $371,000.
The defendant also introduced the testimony of a man by the name of Sturm, who valued the Maret upon the basis of her reproduction cost. Sturm, however, thought that a much higher rate of depreciation should be taken on the vessel than the other witnesses. He thought that 4.77 percent was the proper rate, whereas the other witnesses thought that 2% percent was proper. Applying the rate of %y2 percent to Sturm’s valuation, the reproduction value of the Maret, depreciated, is $396,780.
All of these valuations were based upon the making of the necessary repairs to put the vessel in sound or seaworthy condition, or, as otherwise expressed, to put her in class. There was a divergence of opinion as to the amount required to do so. The chief reason for this divergence of opinion was over the question of whether or not there should be deducted from the valuation put on these vessels the amount necessary to put her in class according to the standards of the American Bureau of Shipping or according to the standards then being applied by Lloyd’s. When the witness said that their valuations were based on the vessel being in a sound or seaworthy condition, did they mean in the condition required by the American Bureau of Shipping or by Lloyd’s % Their testimony does not show what they meant.
Prior to the war Lloyd’s required that a special survey be made of a vessel every three years, but beginning in 1940, after the war had started, Lloyd’s waived this requirement and issued a certificate after a general inspection every year and the making of the necessary repairs indicated by this *817 general inspection. On the other hand, the American Bureau of Shipping required a special survey of the vessel, which was a very much more detailed and intensive survey than the general inspection required by Lloyd’s.
The defendant’s witnesses testified to the cost of making the repairs indicated by this special survey made by the American Bureau of Shipping. Intervenors’ witnesses testified to their estimate of what the cost would be to make the repairs which would probably be indicated by the general inspection required by Lloyd’s. The special survey required by the American Bureau of Shipping showed that the cost of making the necessary repairs to put her in class according to the standards of the American Bureau of Shipping was $302,753; whereas intervenors’ witnesses thought it would only cost about $35,000 to put her in class according to the standards then being applied by Lloyd’s.
The testimony of intervenors’ witnesses as to what might have been required as the result of a general inspection by Lloyd’s is unsatisfactory because no such inspection was made by Lloyd’s, although on the day of the requisition of the vessel, Lloyd’s agents did inspect her, and later took her out on a trial run, as the result of which she was authorized to proceed to a port in the West Indies to pick up a load for a port in the United States, but thereafter she was required to be put in dry-dock for cleaning and overhauling. The witnesses testifying to cost of the necessary repairs had never seen the ship and did not know her condition. On the other hand, the testimony of the cost of putting her in class according to the standards of the American Bureau of Shipping is definite, made up after the work had been done and the cost was known. About the only uncertainty about it is that the work was done on a cost-plus basis, and the witnesses had to estimate what the difference would be between the cost of the work done on this basis and what it would have cost had it been done on a bid basis. Another uncertainty arises from the fact that considerably more work was done on the vessel than merely the work necessary to put the vessel in class; a good many improvements were made on the vessel; hence, the witnesses’ judgment had to be exercised in allocating items to what was necessary to put the vessel in class and *818 wbat, for improvements. The figure of $302,000 is what they say is the proper figure after having allowed for the fact that the work was done on a cost-plus basis, and after having allocated to the cost of putting her in class only such items as are properly attributable thereto.
We see no reason why the owners of this vessel would have changed her registry from Lloyd’s to the American Bureau of Shipping. It would have been expensive to have done so, and there was no necessity for doing so, so far as the record discloses. Certain it is that it would have cost much less to have made the repairs indicated by a general survey of the ship than those indicated by a special survey. The proper amount to deduct from the valuation of the experts as the cost of putting the vessel in class lies somewhere between $35,000 and $302,000. The Commissioner of this court has found that the proper amount to be deducted is $175,000. We see no reason to disagree with this figure.
Deducting this figure from the average of the valuation put on the vessel by intervenors’ expert witnesses, leaves $176,741. This, we take it, is the composite opinion of inter-venors’ expert witnesses of the value of the vessel in her condition when requisitioned. Deducting the $175,000 from the average value put on the vessel in sound condition by defendant’s experts, after adjusting the rate of depreciation, leaves $90,651, which is their composite opinion of the value of the vessel when requisitioned.
These valuations do not take into account the fact that the title to the vessel was in dispute at the time it was requisitioned. The Soviet Government, on the one hand, was claiming title, and the former Estonian owners, on the other hand, were claiming title. Litigation over the vessel began in August 1940, while the vessel was in the harbor of St. Thomas, Virgin Islands. It continued in the District Court of the United States until November 17, 1941, when a motion was made to stay further proceedings indefinitely. Thereafter, on August 22,1947, the Estonian State Cargo and Passenger Steamship Line, which had been nationalized by the Soviet [Republic, filed a petition in this court claiming title to the vessel, and on March 4, 1948, the former Estonian owners filed a motion to intervene, which was allowed, and inter- *819 venors’ petition was filed April 16, 1948. Title to the vessel was not adjudged until our opinion of December 1, 1953 (126C. Cls. 809).
This dispute over the title to the vessel of course affected its market value. As one witness expressed it, only a gambler would buy the ship. All of the witnesses who were interrogated on this subject admitted, of course, this dispute over title would seriously affect its market value. Ordinarily, just compensation is what the owner could get for his property on a free market. On account of the claim of the Soviet Republic, it is doubtful that intervenors could have sold the vessel at all. But, on the other hand, this dispute over title did not particularly concern the defendant. Under its power of eminent domain it could take the vessel and keep it and pay no one until the rightful owner had been determined. The dispute over the title did not affect the value of the vessel to the defendant.
The dispute over the title greatly minimized the value to the intervenors, if they had been required to sell it before the cloud on their title had been removed. It seems unjust that their recovery should be limited to what they could have gotten for the vessel before the cloud had been removed. The defendant is not entitled to choose a time for the taking which puts the owners to a disadvantage, and then take advantage of the owners’ misfortune in fixing j ust compensation. Somewhere between what the vessel was worth to the defendant and what the owners could have gotten for it lies just compensation. According to defendant’s experts, it was worth to the defendant about $90,000; according to intervenors’ experts, about $176,000. We shall assume it was worth $150,000 to defendant. In view of the dispute as to title we think $100,000 is just compensation to the owners.
To this is to be added the agreed value of the consumable stores on board, amounting to $7,707.21, and from the sum is to be subtracted the amount the defendant spent to discharge liens, amounting to $20,842. This leaves the amount of $86,865.21.
In view of the conflict over title, we think the defendant is excused for not having made payment heretofore or until after the time for filing petition for writ of certiorari expires; *820 therefore, intervenors are not entitled to have included in just compensation any sum for delay in payment.
Judgment will be entered in favor of the intervenors for $86,865.21. It is so ordered.
Laeamobe, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
Madden, Judge, concurs in the result.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Currell Vance, and the briefs and argument of counsel, makes findings of fact as follows:
1. This action is brought to secure just compensation for the requisition by the defendant, represented by the Maritime Commission, of title to the Estonian Steamship Maret on September 16, 1941, pursuant to the provisions of Public Law 101, mh Congress, approved June 6,1941, and for the inventory aboard while the vessel was in the Port of St. Thomas, Virgin Islands.
2. The original petition was filed in this court on August 22,1947, by the Estonian State Cargo and Passenger Steamship Line, a corporation organized in Estonia by the Union of Soviet Socialist Republics (USSR). Title to the steamship Maret was claimed under decrees purporting to place title in the original plaintiff of vessels owned by Estonian corporations.
3. On March 4, 1948, a partnership consisting of Tallinna Laevaehisus (Tallinn Shipping Company), an Estonian corporation, and certain individuals were allowed to intervene in the action as intervening plaintiffs. The proof shows ownership of the partnership in the steamship Maret in the following respective amounts:

Shares

_ 36 Isaak Kain-
_ 35 Johannes Linkruus-
_ 47 Tallinna Laevaehisus-
_ 28 Julius Truherg-
_ 10 Josep Meybaum-
__!_ 12. Johannes Inkapool-
_ 12 Theodor Liimann-
Total. 180
*821 4. The original plaintiff continued to participate in this action and in the taking of testimony until June 11, 1952.
5. On February 11, 1953, the trial Commissioner directed plaintiff to file a response to the intervenors’ request for a statement of plaintiff’s claim to title under Rule 29 (b) of the Court of Claims. Plaintiff did not file such response and the intervenors moved to dismiss plaintiff’s petition on the ground “that the uncontroverted facts show that plaintiff has no title to the fund in question, nor any other claim arising out of the requisition by the defendant of the steamship MaretP The court granted the motion dismissing plaintiff’s petition on December 1, 1953 (126 C. Cls. 809), stating in part:
Under the uncontroverted facts in this case, plaintiff is clearly not entitled to recover and its petition is therefore dismissed. The case will proceed upon the petition of the intervenors.
6. In May 1940, Britain and Germany were at war and Britain was attempting to enforce a blockade in Atlantic waters.
7. In June 1940 the Russian Soviet forces overran the Baltic countries, seizing Lithuania on June 15, 1940, and seizing Estonia and Latvia on June 17, 1940. The Soviet Government endeavored to seize Estonian vessels wherever they might be and ordered them to proceed to the Port of Murmansk in Russia with their entire cargo regardless of charter parties or cargo destination, and ship masters were required to follow instructions coming from Tallinn Shipping Company under threats of punishment to themselves and to their families.
8. The Maret sailed with Captain Jakob Hall from Rotterdam on May 5, 1940. It made a voyage to the United States. On a return voyage it was taken under custody to London by a British warship. It was required to unload and load in a search for contraband, being detained in London, England, for two weeks. It then sailed to New York arriving about June 8,1940, where it was chartered by Saginaw Terminal Limited of Canada, and was then engaged to carry bauxite from British Guiana to St. Thomas,' Virgin Islands until August 1940.
*822 9. On August 5, 1940, while the vessel was in the harbor of St. Thomas, Virgin Islands, Captain Jakob Hall was given instructions to clear St. Thomas and take the vessel to Murmansk, Eussia. The Amtorg Trading Company, recognized trading agent in New York City for the USSR, alleged that it had advanced $17,000 to Captain Hall for the ship’s wages, fuel, provisions and other necessities so that the voyage might be made.
10. On August 17, 1940, Johannes Kaiv, who represented the Estonian State, as Counsel General in New York, appointed Leopold Truberg as trustee for owners of shares in the Maret. Truberg filed a libel against the vessel in the United States District Court for the Virgin Islands at St. Thomas on September 11, 1940, alleging he was part owner of the Maret and trustee for others, appointed by Kaiv as Counsel General for Estonia. He also alleged that Captain Jakob Hall was in charge of the vessel; that he, Truberg, had been appointed captain by the owners; that he had demanded that Hall deliver possession of the vessel; and that it was the intention of Hall to clear the vessel and sail to Eussia where the vessel would be seized by the USSR. .
11. The Soviets also endeavored to seize the Maret by way of Court proceedings. When the owners escaped from Estonia, and while under duress in Helsinki, Finland, they issued power of attorney to Charles Eecht in New York City, the attorney for the Amtorg Trading Company in New York.
12. On September 25, 1940, Captain Hall filed an answer alleging that there was no independent State of Estonia, so that Mr. Kaiv could not be Counsel General; that Estonia had been incorporated into the USSR and that the Soviet Counsel General for the USSR was the only such officer representing Estonia. Hall admitted that he refused to turn the vessel over to Truberg and stated that it was his intention to clear for Murmansk, Russia, unless prevented by law. This answer was later amended by Hall on November 12, 1940, when Hall stated that he received the above sailing orders from the Tallinn Shipping Company.
13. On December 11, 1940, Truberg put in an answer to Hall’s amended answer denying the Tallinn Shipping Company had issued orders to Hall to sail to Murmansk.
*823 14. On January 20, 1941, a libel for possession was filed at St. Thomas against the Maret in favor of the Tallinn Shipping Company, Limited, in which it was claimed that that corporation owned 26 percent of the shares and was the lawful representative and manager for all the other owners.
15. On the same date, January 20,1941, Tallinn Shipping filed an answer to the original Truberg libel, above referred to, and denied that Truberg had properly been appointed trustee for the company on August 17,1940, and stated that no one other than the corporation itself had the right to dispossess the master of the ship; that it had theretofore refused and would continue to refuse to deliver the possession of the ship to Truberg; that it intended to clear for some port as it might deem convenient, or as circumstances demanded, but that if the Maret should go to Murmansk, it was denied that the vessel would be seized by the USSR without compensation. It was admitted that Captain Hall had refused to deliver the vessel to Truberg on instructions from the corporation, and the answer stated 152 of the 180 shares of the Tallinn Shipping Company at a meeting on March 10, 1981, had appointed the corporation the exclusive manager and operator of the Maret. It was also stated that Jakob Hall on January 18,1941, had abandoned his job as master without knowledge or consent of the Tallinn Shipping Company.
16. In the meantime on January 20, 1941, the Amtorg Trading Company filed a petition to intervene to claim a maritime lien and alleged that on August 5, 1940, at the request of the Tallinn Shipping Corporation and Hall, as captain, it had advanced for supplies and wages $17,000. This libel was answered on March 3, 1941, by Truberg who alleged that Amtorg did not advance the money for the ship but had advanced it for the USSR to enable the vessel to clear for Murmansk to be seized.
17. On February 3, 1941, Truberg replied to Tallinn Steamship’s libel and its answer. He admitted the existence of the contract to manage the ship, alleged by the Tallinn Corporation, but stated that since July 28, 1940, the Tallinn Shipping Company had ceased to exist because of decrees of the Chamber of Deputies of Estonia on July 23, 1940, men *824 tioning Decree Order 805 nationalizing the Tallinn Shipping Company.
18. On March 25 and 26, 1941, testimony was taken concerning the right of possession and title of the vessel. There was a further hearing on June 18, 1941, and on October 15, 1941, a motion was made by Kaiv and Truberg (and granted) to take in additional exhibits received from abroad.
19. On March 26,1941, Johannes Kaiv petitioned to intervene as colibelant in the Truberg libel proceedings stating, among other things, that he had theretofore appointed Tru-berg as trustee to represent Kaiv in the libel theretofore filed by Truberg; that since that date he, Kaiv, had received a power of attorney from Johannes Inkapool and Theodor Liiman, owners of shares in the Maret; that the petition was filed to protect the property right of all Estonian nationals.
20. On April 5, 1941, answer was filed in the name of Tallinn Shipping Company to the petition of Johannes Kaiv, denying that Mr. Kaiv was the duly constituted Counsel General of Estonia or that he was recognized by the United States Government.
Mr. Kaiv was so recognized. The answer denied his power to appoint trustees or that he had the power to protect the interest of Estonian nationals.
21. On April 15, 1941, Truberg and Kaiv filed answer to the Amtorg lien claim, and denied that the money advanced was in the manner appropriate to create lien.
22. On April 15, 1941, the Estonian State Cargo and Passenger Line (the corporation created by the Soviet decree above-mentioned) filed a libel and claimed the right to possession of the Maret, alleging that it had been organized to take over all vessels of companies nationalized by decrees on October 8, 1940, subject to payment of compensation; that this applied to the Tallinn Shipping Company which at that time owned 26 percent of the shares of the Maret and was entitled to company control and possession.
23. On April 23,1941, Truberg filed his answer to the foregoing claim of the Estonian State Cargo and Passenger Line and denied the allegations set forth.
24. On September 16, 1941, the Maret was requisitioned by the defendant. On September 17, 1941, the West *825 Indian Company filed libel, $8,890.57 for provisions, water, etc.
25. On September 27, 1941, tbe United States attorney at St. Thomas, petitioned the court to intervene in the proceedings and advised the court of the requisition of the Maret on September 16, 1941, by the United States Government.
26. On October 15,1941, a motion was made by Kaiv and Leopold Truberg that the Court receive affidavits and new evidence relating to the ownership of stock of persons outside the United States, and authorizing Kaiv and Truberg to represent the Tallinn Shipping Company and other owners.
27. On October 29, 1941, Truberg, Kaiv, West Indian Company, Amtorg Trading Company, Tallinn Shipping Company and Estonian State Cargo and Passenger Line Corporation filed a joint request that the proceedings be continued without decision until steps could be taken with regard to the requisition of the vessel. This motion was granted on November 17,1941.
The question of the ownership of the vessel continued unresolved, and, on August 22,1947, the dispute was transferred from the District Court for the Virgin Islands to this Court by the filing of a petition by the Soviet-controlled Estonian State Cargo and Passenger Steamship Line. The Estonian interests continued to dispute ownership by filing a motion to intervene in this Court on March 4,1948, which was allowed, and intervenors filed their petition on April 16, 1948. On June 9, 1949, intervening plaintiffs moved to dismiss the original petition and filed a brief in support thereof. On February 6,1950, this Court denied intervenors’ said motion to dismiss and required the taking of evidence on the issue of ownership (115 C. Cls. 815). The original intervenors continued to participate in the taking of testimony until June 11, 1952, and the issue of ownership was not finally settled until December 1, 1953, when this Court granted intervenors’ motion to dismiss the original petition (126 C. Cls. 809).
28. Insurance was carried on the Maret for the owners for the period up through 1939-1940, but no insurance was renewed after the year 1940 because of the nationalization of the vessel.
*826 TEMPORARY OR PARTIAL SURVEYS OF THE SS. MARET UNTIL ARRIVAL FOR REPAIR AT BALTIMORE
29. Under the rules of recognized classification societies, special surveys of a vessel were required to be made every four years so that class could be maintained. The published record of a vessel as being in class, was a notice to the shipping world that in the societies’ opinion the vessel was sound and seaworthy for the carrying of cargo in accordance with its class rating.
30. The Maret received its second special survey No. 3 on May 6, 1936, and was accordingly at'that time recorded by Lloyd’s Kegister as being in class.
■ 31. There is no evidence of Maret examinations between that date and July 20, 1939, when the vessel was placed in dry dock in England for examination. Certain minor repairs were made. A number of additional defects were then observed which the surveyor’s record states were drawn to the captain’s attention. The survey states that it was the owner’s intention to commence a special survey in November 1939 when repairs would be effected. This inspection developed that both port and starboard side bulkhead plating needed attention; that the fidley casing, top plating at fore end in way of stokehold vents, both port and starboard were wasted, and other defects were set out.
32. On September 28,1939, a boiler examination was made and a statement appears in the boiler survey that certain work was to be adjusted on arrival at Hartlepool and such work was done on the boilers.
33. The then owners and operators of the Maret planned to put her through her third special survey No. 1 shortly thereafter. However, because of the war, this was not done.
34. The owners communicated with Lloyd’s and asked for an extension of time to make the required special survey, required by the Lloyd’s rules for the maintenance of class. The records at Lloyd’s disclosed that in answer to the request for an extension of time to make the special survey,- a letter was written to the Tallinn Shipping Company on April 24, 1940, stating in part:
*827 As regards the “Maret”, the third special survey No. 1 becomes due this month, and, as intimated, the Committee will be prepared to grant a year of grace for the completion of this’inspection, provided she is generally examined at an early date and favourably reported on by the society’s surveyors. It is concluded you will arrange for these inspections to be carried out at an allied port, and I shall be glad if you will arrange to call in the society’s surveyors direct for this purpose.
35. Thereafter, on May 5,1940, the Maret was given a general examination at Rotterdam, and certain repairs were made, totaling a cost of 2,094 guilders, or less than $1,000. As a result of this examination at Rotterdam, the Marefs class was extended for 12 months from May 5,1940.
36. On December 27, 1940, the Lloyd’s Register of Shipping sent out a circular letter, “Suspension of Special Surveys”, which states, in part, “the Committee have agreed, as a war measure, to suspend Special Surveys of classed vessels trading in the National Interest, and to replace them by successive General Examinations at twelve-monthly intervals of a nature compatible with a vessel’s state and age.”
Accompanying this letter was a circular giving the extent of the general examination, a copy of which circular is in evidence as intervenors’ exhibit 40. This states, in part:
The Surveyors are only required to recommend such repairs as are found necessary for maintenance of seaworthiness consequent upon the above examinations, and these repairs are to be carried out to their satisfaction.
37. On July 8, 1940, the Maret was grounded in the Demerara River, but refloated at high tide and proceeded downstream. A survey was made by Lloyd’s engineers at Georgetown, British Guiana, the next day, July 4. The survey report reads in part:
As the vessel was loaded with a cargo of Bauxite, a complete internal examination could not be made. I personally sounded all tanks and bilges and found the vessel had not made any water, and soundings compared, with previous soundings taken before grounding. No evidence of straining could be found on external exam-: ination of vessel. * * *
*828 In my opinion this vessel is fit to proceed on her voyage but recommend that vessel be drydocked at Owner’s earliest convenience for examination.
38. Between the first of August 1940, when the vessel arrived at St. Thomas, Virgin Islands, until September 16, 1941, the Maret remained in the harbor at St. Thomas, Virgin Islands. During this time a full crew of 28 men was aboard for about eight months and three quarters of the crew for the remainder of the time.
During the stay in St. Thomas, one boiler of the Maret was under steam at all times. The same boiler was not used all the time but they were alternated from time to time. The engine was turned over once a week for the entire time the Maret was in St. Thomas. This was done to keep the engine in working condition. Scaling and painting was done during this period including the midship house. The decks were covered with a mixture of fish oil and fuel oil whenever they got rusted.
39. On September 16,1941, the United States, through the Maritime Commission, having requisitioned the steamship Maret, chartered the vessel to Lykes Brothers of New Orleans, Louisiana, and the vessel’s name was changed to the Sysonhy, and it was given a Panamanian registry.
40. On the date of the requisition, September 16, 1941, at the request of the West Indian Company, Ltd., Lloyd’s agents at St. Thomas, E. L. Simmons, harbormaster at St. Thomas, and E. H. Johansen, a former marine chief engineer and ship surveyor representing Lloyd’s, went aboard the Maret to make a physical examination for the purpose of reporting on her condition and fitness for a temporary seaworthiness certificate. These surveyors reported as follows:
Decks, Bulwarks, and Stanchions found to be a little rusty but otherwise in good condition. Masts in good condition. Some of the standing rigging rusty but otherwise appears in good condition. Derricks are apparently in good condition. Anchor windlass tried out and found to be in working order, needs greasing and oiling. Forward deck there are five Freeing ports on each side. One Freeing port on port side missing, and one broken. One also missing on starboard side. After deck there are four Freeing ports on each side. Three Freeing ports on port side missing, and one on starboard *829 side. All cargo winches- tried out and found to be in . running condition, needs greasing and oiling. Sounding pipes all apparently in good condition. Steering gear tried out and found to be in working order. Hatch combings all in good condition, also beams, battens and tarpaulins. Bulkheads rusty but in sound condition. Flooring in all cargo holds more or less bad in places, especially No. 1 cargo hold.
No cargo battens in any of the cargo holds.
Wooden casing over shaft tunnel broken in places.
Outside plating very rusty, with heavy scales and rust blisters.
■The bottom as far as could be seen from a boat is very foul, has about four inches growth on it.
The propeller and rudder is also very foul.
The engine is apparently in workable condition, but should be tried out to ascertain condition of same; also the condenser.
The starboard boiler was examined inside and found to have approximately one eighth of an inch scale on the Furnace Crown. Some of it had partly dropped off from the rust underneath it. The exterior of the boiler is in fairly good condition except for some rust on Combustion Chambers, mostly on top.
The port boiler is under steam for auxiliaries, but has not been cleaned during the fourteen months that the steamer has been laid up.
Taking into consideration the condition of the boilers, and the length of time that they have not been cleaned, we do not think it advisable to raise the steam pressure on them to test out the engine.
RECOMMEND :
That in the interest of all concerned that the boilers be cleaned, engine tested, and if found satisfactory the vessel to be taken out on a trial run before a temporary certificate of seaworthiness can be granted.
These engineers did not drill test holes in the sides or on deck in making their examination. The examination was made during the course of one day.
41. On October 21, 1941, a trial trip of several hours was taken, and an examination made thereafter by Lloyd’s repre-. sentatives, E. L. Simmons and It. H. Johansen, who made the following continuation survey report:
On October 21st 1941, at 11.30 a. m. the ship was got underway and taken out on a trial trip for three hours. *830 There was a light breeze from the South, and a smooth sea. .On the outward run the ship averaged a speed of 5.3 knots per hour, and on the inward run the ship averaged a speed of 5.8 knots per hour.
The boilers, engine, and auxiliaries appeared to be in good working condition, with the exception of the Stuffing Box on the High Pressure Slide Valve rod which is leaking too much and should be repacked.
We are therefore of the opinion that the S. S. “Sysonby” is in a seaworthy condition to proceed on a voyage to a port in the West Indies to load for a port in the United States. After the cargo has been discharged the vessel should be placed in drydock for cleaning and overhauling.
42. Arrangements were made for the vessel to go to the United States to be placed on the drydock for cleaning and overhauling and permission was given to proceed on the way thereto to a West Indian Port to take a load for a port in the United States.
Thereafter a cargo of sugar was loaded in Cuba with the ship’s winches and they worked satisfactorily. The sugar cargo was carried to Philadelphia, with no damage to the sugar from sea water during the voyage from Cuba to Philadelphia.
43. From Philadelphia, the Maret went to Baltimore, arriving on November 19, 1941, where she underwent repairs at the shipyard of the Bethlehem Steel Company.
44. The surveys made, and the repairs performed in Georgetown, British Guiana, and St. Thomas, Virgin Islands, were in each case required for voyage continuance, and in each case the Lloyd’s representative recorded that the vessel should be later drydocked for examination. The last general examination made for extension of special survey was the one made May 5, 1940, at Rotterdam, and since this was a 12-month extension it expired on or about May 5, 1941.
45. There was no evidence offered in this case that after the extension granted by the Lloyd’s committee in May 1940, extending for 12 months the requirement of a special survey for the Maret, that any additional extension had been granted. The records of Lloyd’s show that in 1940 the Maret by reason of the above extension, was still published as in class, but that in January 1940, Lloyd’s Register added a *831 statement “surveys delayed” which was a public explanation that there was a survey overdue.
SOUND OR CLASSED VALUE OK THE STEAMSHIP MARET
SEPTEMBER 16, 1941
46. The steamship Maret was requisitioned by the United States Government for title on September 16,1941.
47. The Maret was of the following particulars:
Gross tonnage_ 3025.
Net_1794.
Deadweight_ 4870.
Draft_20' 5%”.
Speed_9 knots x%8 tons best Welsh coal.
Single deck, built of steel, at Sunderland in 1910 to Lloyd’s special survey and carried Lloyd’s highest class, powered with a triple expansion engine with two Scotch boilers, length over-all 325', between perpendiculars 315.5'; beam 46.5'; depth 21.5'; moulded 23.4'; deck ■ single (Iron); Hull — steel; holds — 3; hatches — 5; winches — 5; engine — triple expansion 23-38-62% x 42 stroke; boilers 2 Scotch. The Maret was a typical single deck tramp steamer of her time.
48. The standard methods of valuation, market value and reproduction cost less depreciation, were used by both sides in arriving at what they considered the value of the Maret.
49. To show market value, the intervenors called witnesses Kjeldsen, whose testimony was taken in London, and Berg-lind, whose testimony was taken in Stockholm, and their counterparts for the defendant were Rutland and Pierot.
50. The intervenors called the witness William A. Bagger, consulting engineer and marine surveyor of 37 years’ experience in New York, who represented the United States Government and other governments in appraisals, and who is qualified as an expert in many United States courts. Mr. Bagger used the reproduction cost less depreciation value. His counterpart for the defendant was the witness Sturm.
51. The witness Kjeldsen on the basis of the market appraised the Maret as of September 16, 1941, with surveys overdue at £78,500, equivalent to $314,000, at the exchange rate of $4 per pound, which was the prevailing rate in September 1941. He arrived at this figure by comparisons with *832 foreign ship sales between April and August 1941. However, this witness’ computation was in error. Correctly computed, his valuation was £76,000, or $298,628'.
52. Of the ships listed in intervenors’ exhibit 7, Kjeldsen selected the Haifa Trader as most comparable to the Maret. This ship was sold from Palestine to Ireland at £82,500, with delayed delivery. He appreciated the Maret 2% percent over the Haifa Trader because seven years younger, made other allowances for speed, full consumption and deadweight, also made an allowance for delayed survey of £13,750. This would make the value of the Maret in class £88,407 or $353,628.
53. Kjeldsen arrived at the figure of £13,750 for reclassification repairs because the owners had informed him that estimates of five to ten thousand pounds had been made for the classification repairs. He took the highest figure, £10,000, and added one-third because of survey being overdue. There is no evidence to support these estimates of the owners of the cost of the classification repairs.
54. The witness Kjeldsen relied mainly on the Haifa Trader as the standard in determining the value of the Maret, as being the closest and fairest basis.
55. When pressed for other sales, on cross examination, Kjeldsen considered next the Noemijulia. The Noemijulia was sold for £70,000 or $280,000, with survey overdue, which is at the rate of $73.68 per deadweight ton. Making allowance for the difference in age of 15 years, at the rate of 21/2 percent progressively, the rate per deadweight ton for the Maret would be $96.80 or a total of '$420,716 in her condition of “delayed survey.”
56. The Vassilios Destounis of 6200 deadweight tons, built in 1912, sold for £142,000 or $568,000 at the rate of $91.61 per deadweight ton. After making allowance for the difference in size and age, based on this vessel, the value of the Maret would be $428,119; making the same deduction of $55,000 for repairs, the value of the Maret as she was September 16,1941, would have been $373,193.
57. In comparing the other ships in intervenors’ exhibit 7, with a deduction of $55,000 for being overdue for classifica *833 tion and after allowances for age and deadweight, the value of the Maret would be as follows:
Ship Built Dwt. tons Selling price Date sold Steamship Maret
Ceturti_ 1884 3150 $240,000 June 1941-$482,930
Tegucigalpa.. 1897 4300 500,000 Aug. 1941. 669,673
Arena_ 1917 7300 1,390,000 Aug. 1941. 669,217
58.The witness Berglind testified as to sales of ships by Swedes to Swedes, as sales of Swedish ships, were restricted and permitted only to Swedish nationals. He used three ships for comparison. The Trio sold for trading outside the Baltic, and the Vila and Theodor sold for trading in the Baltic. Converting Swedish currency to U. S. dollars at 420 Swedish crowns to the dollar, we have the following valuations:
Ship Built Dwt. tons Selling price Price per dwt. ton
Trio_ 1922 2420 $273,809 $113
Vila_ 1920 2950 287,142 90
Theodor.. 1920 3200 309,524 96
Average 20% years ; average dollars per ton $99.66.
59. Based on this schedule, Berglind placed a value of the Maret at two million Swedish crowns or $476,190 to trade outside the Baltic, and, of course, the Maret was outside the Baltic. These three Swedish ships averaged 20% years in 1941 or 10% years younger than the Maret. The witness made some allowance for this difference in age without stating how much. Assuming 2% percent progressive to be the fair depreciation under the circumstances of September 16, 1941, as used by Kjeldsen, by Butland, by Pierot, and by Bagger, and applying that rate progressively for 10% years, we arrive at a value for the Maret of $363,696, by comparison with restricted Swedish sales to Swedes, which was the basis of Berglind’s testimony.
60. The witness Bagger used the reproduction cost less depreciation method of appraising the Maret, and fixed the valuation at $338,000 in sound or reclassed condition.
*834 Tbe reproduction cost of the Maret in September 1941 was arrived at by comparison with the contract price of building the EC-2 type ships, built for the United States after May 1,1941, which was $157 per ton.
To this per ton cost, the witness applied the Pennypacker formula, which relates only to the size, speed and cost of vessels, for the difference between the EC-2 and the Maret, and this resulted in a fraction of 102/110 which gives the cost per ton of reconstructing the Maret. Multiplying the cost per ton by 4870, he obtained a reproduction cost of the Maret in September 1941 of $743,000, on a mass production basis, which is from 25 to 30 percent lower than construction on a single ship basis. He depreciated this cost at 2y2 percent progressively for 31 years and found a residual value for the Maret of 0.455. By multiplying the reproduction cost by the residual factor 0.455, he obtained the value of $338,000 for the Maret in September 1941 in sound or reclassed condition.
61.The sound or reclassed values of the Maret given by the intervenors’ valuers are as follows :
Haight $320,000
Bagger — 338,000
Kjeldsen 353,628
Berglind 363, 696
or an average of $343,831.
62. Beginning with May 15,1940, which was after the general examination repairs made at Rotterdam, the Maret was insured in the British market for £80,000, equivalent of $320,000, and that insurance was continued in effect until Tallinn Shipping Company was nationalized in the fall of 1940, at which time Tallinn Shipping Company, so long as it was subject to Soviet domination, lost control of the ship. ■
63. The witness Rutland called by defendant testified that the sound value of the Maret, in his opinion, at the time of the requisition was $189,064, based upon a comparison with nine foreign vessels sold from January to October 1941, listed on defendant’s exhibit 23.
These vessels include the Asiatic, Flowergate, Frederica Lenson, and Seringa, which were British-flag ships, and came under the restrictions of sale of British tonnage.
*835 Based upon a comparison of the sale price of six vessels sold in the United States during 1941, and allowing for the age differential, computed at 2% percent per year, he found the value of the Maret to be $232,788.
Based upon both foreign and domestic sales, he found the value to be $220,173.
64. Defendant’s witness Pierot valued the Maret at the time of requisition at £45,000, or the equivalent of $180,000, in sound seaworthy condition. He based this price on comparison with the sale of the Frederica Lenson, Seringa, and the Asiatic, which were British-flag ships and subject to British sales restrictions, but he made an allowance for the inapplicability of these restrictions to the Marret.
65. As to the sale of foreign flag ships free from governmental restrictions, Pierot testified that the Haifa Trader was a comparable ship to the Maret, and sold for £82,500, or $330,000. The Maret being 630 tons lighter, he made an adjustment of that difference in tonnage at £5 per ton. This would amount to £3,150 or $12,600. He allowed for depreciation of seven years for difference in age in favor of the Maret at 2y2 percent per year, which would result in $53,600 being added to the Haifa Trader price for the value of the Maret on account of difference in their ages, and would make the value $383,631. From this should be subtracted $12,600 because of the Maretfs lesser tonnage, making a net of $371,000. This does not take into account the amount required to put the Maret in class.
66. Defendant’s witness Sturm found the reproduction cost of the Maret to be $859,000, or $116,000 more than the intervenors’ witness Bagger. He depreciated that value progressively at 4.77 percent, and arrived at a valuation of the Maret at the time of requisition in sound or reclassed condition at $192,000. However, because of the litigation in St. Thomas, it was his opinion that the Maret “was worth nothing”, and he testified that the scrap value of the Maret was $13,000 under the same circumstances of litigation.
67. The witness Sturm arrived at his rate of depreciation by comparing reproduction costs of eleven American ships with the prices for which they sold in 1941, in the restricted American market at prices controlled by the United States *836 Government. He was not influenced by foreign sales in arriving at the rate of 4.77 percent. He did not deny that the rate of depreciation could be as low as 2y2 percent if the market was extremely high, and that the higher the market, the lower the depreciation rate would be.
68. The Maret was not subject to the restricted American market solely used by the witness Sturm in arriving at the rate of 4.77 percent. His formula in the circumstances surrounding the Maret was unrealistic, and the depreciation rate of 2y2 percent progressive, as applied by all of the other valuation witnesses, including the defendant’s witnesses Rutland and Pierot, and as admitted by this witness as a possibility, was the more appropriate rate of depreciation in September 1941.
69. Applying the depreciation rate of 2% percent progressive, to witness Sturm’s reproduction cost of $859,000 for 31 years, results in a sound or reclassed value for the Maret of $396,780.
70. The consumable stores on board the Maret on September 16,1941, were of the value of $7,707.21, which amount the defendant does not contest.
REPAIRS
71. The cost of repairs is of concern in this suit only because the appraisers based their value of the Maret in sound or classed condition.
All of the witnesses who testified on the point agreed that a ship in class is in sound and seaworthy condition.
72. There is a sharp divergence of opinion respecting repairs between the witnesses Hargan and Stanley called by intervenors and the witnesses for defendant on two points:
(a) Extent of repairs; and
(b) Price of repairs.
The intervenors claim that only the amount of repairs necessary for retention of class with Lloyd’s is to be deducted from the sound or classed value of the Maret to obtain the amount of just compensation, while defendant claims that the entire costs of the so-called maintenance repairs made by the defendant, which put the Maret through her third *837 No. 2 survey, and to reclassify her in the American Bureau of Shipping, are deductible from sound value to obtain the amount of just compensation, although that survey was not due until 1945.
73. The Maretfs extension of class by reason of the general examination in Rotterdam, was in effect until May 1941, (one year’s extension from May 1940). On December 27, 1940, while the extension of class was still in effect, Lloyd’s dispensed with special surveys and substituted “twelve monthly” examinations. The new rule of Lloyd’s provided that upon completion of the twelve-monthly examination and such repairs as were found necessary, an official certificate would be issued indicative of continuance of class. Thus, if the intervenors had not been deprived of their ship, it could have maintained its class in Lloyd’s by performing the limited requirements listed by Lloyd’s in their bulletin issued December 27,1940. See finding 36.
74. The special survey due on the Maret was the third No. 1 survey. Nevertheless, defendant’s exhibit 31 indicates that the Maret was put through the third special No. 2 survey, which was not due for four years. The requirements for successive surveys become more rigorous and more expensive as the age of the vessel advances.
75. Repairs were made on a cost-plus basis and consisted of repairs for so-called maintenance, betterments and defense. The different categories of work were performed at the same time and all lumped into two bills in the sum of $559,016, of which the defense items were $112,000, better-ments. $50,100, and the balance $396,916 was maintenance, which defendant claims is for owner’s account.
76. Defendant’s witness Yule prepared a statement (defendant’s exhibit 5) composed of items which he considered as required and chargeable to the owners, with the amount which he estimated each particular item would cost on a contract or bid basis, totaling $326,070. Defendant’s witness Clark disallowed items 181, $350; item 203, $125, and item 268, $50; totaling $525, leaving a balance of $324,545.
77. During cross-examination of Mr. Yule, he prepared another statement (defendant’s exhibit 6), totaling $21,792, *838 which he admitted listed items not classification items. This sum should also be subtracted from Mr. Yule’s estimate,, leaving a balance of $302,753.
78. The intervenors contend that the deduction from the amount of sound or classed value to obtain the measure of just compensation should be only such amount as would be required for repairs to pass the general twelve-monthly examination which was due in May 1941.
79. The witness Hargan estimated that the cost of repairs for maintenance and class would amount to $7,177.
80. The witness Stanley was in agreement with the witness Hargan, both as to the extent of the repairs required, and the cost of the items, with the exception that he felt the witness Hargan required too much to be done. However, the intervenors at the hearing stated they would stand on Hargan’s figures.
81. Neither Hargan nor Stanley had seen the vessel.
82. The specifications listing the work actually done were made up by Mr. Yule from work orders prepared with Maritime Commission’s surveyor, Mr. Dryden, and the witness Clark, representing Lykes Bros., operator of the ship for defendant. Said specifications were prepared in retrospect, after the repairs on the Maret were completed, rather than as requirements for prospective work to be done.
83. There is no evidence that anyone connected with repairing the Maret, at Baltimore, tried to reduce the extent of repairs alleged to have been required by the American Bureau of Shipping. It is common practice for the owner’s surveyor to attempt to hold down the extent of repairs, and at times he succeeds. Lloyd’s rules provide a method of appealing from the surveyor’s recommendation.
84. Yule has found and testified that there was actually spent by the defendant for the purpose of putting the vessel in class the sum of $396,916. However, recognizing that the method of doing such work was unreasonably expensive, he has estimated that such work on a bid basis would have cost $326,071. From this sum he has deducted $21,972 as the price of work included in said sum, not involving items necessary for class, thus leaving Yule’s estimate of cost of placing the vessel in class at $304,099. Said sum represents Yule’s *839 estimate of the cost for reclassifying by the American Bureau of Shipping.
85. The intervenors’ contention is that since the vessel had previously been classified under Lloyd’s, and since Lloyd’s for the duration of the war had abandoned the requiring of special surveys and was allowing vessels to keep in operation merely by submitting to annual general examinations, and performing the work required thereby, that there should be deducted only the cost of continuing in class under such system, or the sum of $7,177.
86. None of the valuations of plaintiffs’ and defendant’s witnesses take into account the location of the vessel when requisitioned, nor the conflicting claims of ownership. All the witnesses for the defendant, and some for the intervenors, testified, in effect, that, because of the litigation over the vessel, it would have been hard to find a buyer at any price. One of the defendant’s witnesses said, “Only a gambler would buy the ship.” However, litigation gave rise to no obstacle in the acquisition of title by the defendant. The defendant simply took the vessel, leaving to future determination the question as to whom the compensation should be paid.
However, such litigation would present an obstacle to the acquisition of a clear title by a commercial purchaser. It seems unlikely that any such purchaser would have attempted to buy the Maret in the face of the conflicting claims to title.
87. Intervening witness Hargan has estimated that the proper cost for doing repairs actually done on the Maret in Baltimore by Bethlehem Steel Company would have been in the neighborhood of $164,000. Roughly, it is estimated that $175,000 should have been sufficient for the purpose.
88. The defendant deposited on June 6, 1942, with the Treasurer of the United States, the sum of $25,000, on account of just compensation for the Maret, as a fund available to pay accrued liens, as provided in the statute.
Payments were made from said deposit by the Treasurer in the amount of $20,842, for the account of the intervenors, and this amount is properly deductible from the amount of just compensation found to be due to the intervenors.
89. For the cost of putting the vessel in class, the average of the valuations put on the vessel by defendant’s witnesses *840 .was approximately $90,000. The average valuation of the intervenors’ witnesses was about $176,000, after making the same deduction. It is found that the value of the vessel to the defendant was $150,000. Taking into account the conflicting claims of title, it is found that $100,000 is just compensation to the owners for the requisition of the vessel.
To this is to be added the agreed value of the consumable stores on board at the time of requisition amounting to $7,707.21. From the total sum of $107,707.21 there is to be deducted the sum of $20,842, which is the amount spent by the defendant to discharge liens on the vessel. This leaves a balance due intervenors of $86,865.21.
90. On account of the conflicting claims to title, the owners are not entitled to include in just compensation any sum for delay in payment.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the intervening plaintiffs are entitled to recover, and it is therefore adjudged and ordered that they recover of and from the United States eighty-six thousand eight hundred sixty-five dollars and twenty-one cents ($86,865.21).